IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| WESTPORT INSURANCE CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:12cv70 LMB/JFA |
| ) | |
| SHAPIRO & BURSON, LLP., ) | |
| ) | |
| Defendant. ) | |

FILED
2012 JAN 23 P 5: 05
CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## DECLARATORY JUDGMENT COMPLAINT

Now Comes Plaintiff, Westport Insurance Corporation ("Westport"), by its undersigned attorneys, and for its Declaratory Judgment Complaint against Shapiro & Burson, LLP ("S&B"), states as follows:

### NATURE OF THE ACTION

1. Westport brings this action pursuant to 28 U.S.C. §§ 2201 and 2202 for a declaratory judgment that a Lawyers Professional Liability Insurance Policy, No. WLL301004648205, issued to S&B for the policy period July 21, 2010 to July 21, 2011 (the "Policy"), described herein at Paragraph 33 below and attached as Exhibit A, should be rescinded and declared void *ab initio* based upon material misrepresentations made in the application for insurance, attached as Exhibit B, regarding S&B's knowledge of any claim or circumstance that could result in a professional liability claim, when S&B, through its managing partner John Burson ("Burson"), knew that there were issues regarding attorneys, acting as substitute trustees in numerous foreclosure actions throughout Maryland, wrongfully signing one another's names to affidavits and filing such affidavits with various courts.

1

2. S&B's misrepresentations and nondisclosures presented an inaccurate picture of its liability exposure to Westport. Had Westport's underwriter known the truth about the matters S&B misrepresented in its application, Westport would not have issued the subject policy to S&B as written, or for the premiums charged, or at all. As such, this Court should issue a declaration that the Policy should be rescinded and is void *ab initio*.

3. In the alternative, Westport seeks a declaratory judgment that Westport has no duty to defend or indemnify S&B and its current and former attorneys for certain claims tendered to Westport because the Policy does not provide coverage for these matters and/or coverage is precluded by the terms, conditions and exclusions of the Policy.

4. Further, in the alternative, this Court should reform the Policy with regard to an incorrect extended reporting period endorsement form which was included with the Policy due to a scrivener's error.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). There is complete diversity of citizenship between plaintiff and defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper pursuant to 28 U.S.C. § 1391 because the defendant S&B is domiciled in Virginia and the events giving rise to the claim at issue in this action occurred in this district.

7. An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties.

## PARTIES

8. Plaintiff Westport is an insurance company organized under the laws of Missouri with its principal place of business in Kansas.

9. Defendant S&B is a Virginia limited liability partnership with its principal place of business in Fairfax, Virginia.

## FACTUAL ALLEGATIONS

10. On April 7, 2011, claimants Charles Smalley and Pamela Ball filed a complaint, on behalf of a proposed class, in the United States District Court for the District of Maryland, against S&B, Burson, S&B associate William Savage ("Savage") and former S&B associate Jason Murphy ("Murphy"), among others, captioned Case No. 8:11-cv-00906-JFM. The Smalley Complaint alleges that S&B and its attorneys conducted an "unlawful robo-signing operation," by, among others, signing affidavits in foreclosure proceedings without verifying that the statements in the affidavits were true, thereby causing plaintiffs, Maryland homeowners who had been foreclosed upon by S&B, to be charged illegal fees. The complaint alleges fraud, RICO violations, conspiracy to commit fraud and violations of the Maryland Consumer Protection Act and seeks actual damages, statutory damages, punitive damages, treble damages, disgorgement of attorney's fees, costs and attorneys fees in prosecuting the class action. A true and correct copy of the Smalley Complaint is attached as Exhibit C.

11. On September 22, 2011, claimants Smalley and Ball filed a First Amended Class Action Complaint in the Smalley Action. The First Amended Complaint asserts an additional four counts against S&B for violations of the federal Fair Debt Collection Practices Act ("FDCPA") and Maryland debt collection laws, as well as disparate impact violations of the federal Fair Housing Act and Section 1982 of the Civil Rights Act. A true and correct copy of the First Amended Smalley Class Action Complaint is attached as Exhibit D.

12. Claimant Samuel Molina ("Molina"), on behalf of a proposed class, filed a complaint in the United States District Court for the District of Columbia on October 3, 2011,

captioned Case No. 1:11-cv-01759-ABJ, against S&B, among others. Molina asserts claims arising out of the allegedly predatory loan issued to him and pre-foreclosure activity with regard to his Alexandria, Virginia property. As to S&B, Molina alleges that S&B, as the alleged "third-party default service vendor," conducts an "illegal robo-signing operation," "maintain[s] a practice of forging essential foreclosure documents," and has a systemic lack of document verification. A true and correct copy of the Molina Complaint is attached as Exhibit E.

13. Claimant Molina alleges disparate impact violations of the Fair Housing Act and § 1982 of the Civil Rights Act and violations of the federal Fair Debt Collection Practices Act against S&B, and seeks "actual and compensatory damages," "statutory, consequential, incidental, and non-economic damages," punitive damages "as permitted by statute and common law not less than $1.5 Million on a class-wide basis," attorney's fees, court costs, litigation expenses and other relief. (Ex. E at p. 38.)

14. On November 21, 2011, S&B placed Westport on notice of claim against it and Burson, among others, by Jason Murphy and Erik Yoder ("Yoder"), in the form of a threatened lawsuit to be filed in the Circuit Court for Prince George's County, Maryland ("Murphy Lawsuit"). The plaintiffs are former attorney employees of S&B and assert claims against S&B and Burson for defamation/slander & libel, defamation/false light, intentional infliction of emotional distress, negligent hiring and supervision, negligent supervision, negligence, invasion of privacy, unjust enrichment, tortious interference with prospective advantage, wrongful discharge and civil conspiracy.

15. In the Murphy Complaint, plaintiffs allege that S&B employed a "foreclosure factory" model, was aware that Yoder and Murphy had a signing agreement whereby they, as co-substitute trustees, signed one another's names to affidavits in connection with foreclosure

filings due to the time pressure associated with processing voluminous foreclosure filings quickly, and that non-attorney S&B staff misappropriated Murphy and Yoder's signatures in foreclosure filings as part of S&B's "rampant forgery practice."

### S&B's False and Misleading Statements in the Insurance Renewal Application

16. On June 15, 2010, John Burson, as managing partner for S&B, signed the Westport Lawyers Professional Liability Insurance Renewal Application Addendum ("Application Addendum"). (Ex. B at p. 8, SP 4 137 0108 at Page 3 of 3.)

17. The Application Addendum provided, in relevant part:

> **RENEWAL CLIENTS WHO HAVE PREVIOUSLY COMPLETED APPLICATION:** Please review this application, along with all applicable supplements and attachments, and supply us with updated information. Additionally, if there have been any changes to information appearing on this application and any supplements or attachments, please provide details of those changes in the space below. **Failure to report a change could result in being underinsured or uninsured.**

(Ex. B at p. 6, SP 4 137 0108 at Page 1 of 3.)

18. Further, under the signature line, signed by John Burson, the Application Addendum states:

> *The Applicant understands and agrees that she or he is obligated to report any changes in the information provided in this addendum that occur after the date of completion and before policy inception.*

(Ex. B at p. 8, SP 4 137 0108 at Page 3 of 3.)

5

19. The broker, USI Affinity, issued a "quote proposal" letter to the insured dated July 7, 2010, acknowledging receipt of the insured's completed renewal application and enclosing a quote proposal. Importantly, the letter states:

> PLEASE NOTE: Coverage is written on a claims-made basis. All CLAIMS or Circumstances that could result in a claim if known prior to the inception date are specifically excluded. Report all known claims or circumstances to your current or prior insurance carrier.

(Ex. B at p. 90 "Quote Proposal Copy.")

20. The enclosed "Coverage Order Request Form" ("Quote Proposal Copy"), was signed by John Burson on July 9, 2010, and returned to Westport through the broker, and contains the following "Warranty Statement":

**WARRANTY STATEMENT**

This is to acknowledge that I/we am/are not aware of any claim and/or any circumstances, acts, errors or omissions that could result in a professional liability claim.

This will also certify that to the best of my/our knowledge, the information given on the Westport application is unchanged since it was completed on 06/15/2010, including supplemental information provided.

Also, any related claim or potential claim matters have been reported on all subsequent applications and to the appropriate carrier.

(Ex. B at p. 91.)

21. Mr. Burson was aware, prior to policy inception on July 21, 2010, that Yoder and Murphy had wrongfully signed one another's names to numerous affidavits in voluminous foreclosure filings throughout Maryland, which could result in a CLAIM under the Policy, yet did not disclose the facts and circumstances regarding the "signature issues" in the renewal application and Warranty Statement to Westport.

6

22. Specifically, an e-mail chain, dated April 5, 2010, between John Burson and associate Erik Yoder, reflects that Mr. Burson knew, prior to Policy inception, that Yoder and Murphy had been signing one another's names to affidavits in connection with foreclosure filings. At 9:19 am on April 5, 2010, Mr. Burson wrote an e-mail to Mr. Yoder, stating, in relevant part:

> Erik,
>
> You MUST be more careful. Our new attorney, just hired, looking at orders to docket behind found you signing the affidavit saying we mailed the NOI when the LENDER mailed the NOI. Erik, these are affidavits. We did not send the NOI. We have certain clients who send their own. It[']s obvious from looking at the file as to who sent it. We have our own font that is recognizable. The lender had to give us that affidavit.
>
> . . .
>
> The most IMPORTANT thing is that affidavits you sign under penalty of perjury must be true to the best of your knowledge. We cannot be signing the affidavit of mailing if we did not mail it. This is something that someone will catch at some point if you do this very much. Thank goodness we caught this one before it was filed.

A true and correct copy of the April 5, 2010 e-mail is attached as Exhibit F.

23. Upon information and belief, "NOI" refers to Maryland Rule 14-210(c) notices. In November 2010, Yoder and Murphy sent letters to the Chief Judge Robert M. Bell of the Maryland Circuit Courts notifying him that Maryland Rule 14-210(c) notices in numerous foreclosure filings were not sent for approximately the past year, despite affidavits, signed by Murphy and Yoder, to the contrary. Rule 14-210(c) notices prior to sale require counties or municipal corporations to "receive written notice not less than 15 days before the sale, of the individual authorized to make the sale as well as the time, place, and terms of the sale." In their letters to Judge Bell, Murphy and Yoder state that they believed the S&B firm procedures in place with regard to the sending of notices to the counties were being met and fulfilled by the appropriate staff designated with this task when they signed the affidavits, but that they came to

learn on or about November 1, 2010 that the required notices in fact were not sent, and as such, the portion of the affidavit that states that notices were sent is inaccurate. True and correct copies of Mr. Murphy and Mr. Yoder's letters to Chief Judge Bell are attached as Exhibits G and H.

24. By return e-mail at 10:36 am on April 5, 2010, Mr. Yoder responded to Mr. Burson's e-mail, copying fellow associate Jason Murphy and office manager Leanna Kennebeck, stating:

John,

Please check the signature. I did not sign this otd. Jason signed my name on this one. As we have discussed before, [J]ason and I have signed for each other on these lines. From this point forward we will not sign for each other. I am familiar with the issue here as far as signing an affidavit stating that we mailed the noi when in fact the client mailed the noi.

(Ex.F.)

25. Additionally, on April 7, 2010, office manager Leanna Kennebeck e-mailed Jason Murphy asking, "Any reason why you didn't sign the OTD's yesterday?..." Mr. Murphy responded, "Yes. John [Burson] told me not to sign in [E]rik['}s name. All of those were in his name." Ms. Kennebeck replied to Mr. Murphy, "You were in the same meeting as I. What he [John Burson] said was to CROSS OUT the other person's name and insert yours." A true and correct copy of the April 7, 2010 e-mail is attached as Exhibit I.

26. Upon information and belief, the April 7, 2010 e-mail references an S&B firm meeting which was held in April 2010, attended by John Burson, wherein Mr. Murphy and Mr. Yoder were instructed not to sign one another's names to affidavits.

27. Once the "signature issues" came to light, numerous courts in Maryland instituted Show Cause Orders against S&B and its attorneys and staff. In one such proceeding, hearings

were held before Special Master Elizabeth A. Ritter of the Circuit Court of Baltimore City. As part of that proceeding, both Mr. Murphy and Mr. Yoder testified about the April 2010 firm meeting, wherein they were instructed to no longer sign one another's names to affidavits. Special Master Ritter summarized Mr. Yoder and Mr. Murphy's testimony regarding the April 2010 firm meeting in her June 23, 2011, Master's Report and Recommendations, a true and correct copy of which is attached as Exhibit J (p. 10, 12-13.)

28. Accordingly, Mr. Burson's warranty statement in his July 9, 2010 renewal application submission for the Policy that he "was not aware of any claim and/or any circumstances, acts, errors or omissions that could result in a professional liability claim" was false. (Ex. B at p. 91.)

29. The Murphy Lawsuit also alleges that S&B and its managing partner Mr. Burson had actual knowledge of the "signature issues" long prior to Policy inception on July 21, 2010.

30. Therefore, by the time the Westport Policy incepted on July 21, 2010, S&B, through its managing partner John Burson, was aware of facts or circumstances that might be expected to be the basis of a claim or lawsuit, but did not disclose these facts or circumstances to Westport.

31. S&B did not submit any supplement after the date of the renewal application and before the Policy incepted.

### The Westport Policy

32. In reliance on Mr. Burson's false and misleading representations in S&B's renewal application and Warranty Statement, Westport issued the claims-made and reported Lawyers Professional Liability Insurance Policy, No. WLL301004648205, to S&B for the policy period July 21, 2010 to July 21, 2011. A true copy of the policy as issued to S&B is attached as Exhibit A. As set forth in Count IV of this action, the policy as issued to S&B contained a

9

scrivener's error with regard to the Extended Reporting Period Endorsement, for which Westport now seeks, in the alternative, reformation of the policy.

33. The Policy provided an effective policy period from July 21, 2010 through July 21, 2011. (Ex. A, Declarations, Item B.)

34. The relevant Insuring Agreement of the Policy's professional liability coverage states as follows in pertinent part:

> The Company shall pay on behalf of any INSURED all LOSS in excess of the deductible for which any INSURED becomes legally obligated to pay as a result of CLAIMS first made against any INSURED during the POLICY PERIOD and reported to the Company in writing during the POLICY PERIOD or within sixty (60) days thereafter, by reason of any WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if any . . ."

(Ex. A, Section I., Insuring Agreement A.)

35. The Policy defines the term "LOSS" as:

> "[T]he monetary and compensatory portion of any judgment award or settlement, provided always that LOSS shall not include:
>
> 1. civil or criminal fines, penalties, fees or sanctions;
> 2. punitive or exemplary damages;
> 3. the multiplied portion of any multiple damages;
> 4. the return by any INSURED of any fees or remuneration paid to any INSURED; or,
> 5. any form of non-monetary relief."

(Ex. A, Section II., Definition F.)

36. The Policy defines the term "PROFESSIONAL SERVICES," in relevant part, as "services rendered to others in the INSURED'S capacity as a lawyer, and arising out of the conduct of the INSURED'S profession as a lawyer..." (Ex. A, Section II., Definition O.)

37. The Exclusions section of the Policy states:

> "This POLICY shall not apply to any CLAIM based upon, arising out of, attributable to, or directly or indirectly resulting from:

10

\* \* \*

C.    the certification or acknowledgement by any INSURED, in his or her capacity as a Notary Public, or a signature on a document which the INSURED did not witness being placed on the document;

D.    any CLAIM made by any INSURED under this POLICY against any other INSURED under this POLICY unless such CLAIM arises out of PROFESSIONAL SERVICES by any INSURED rendered to such other INSURED as a client;

\* \* \*

F.    any intentional, criminal, dishonest, malicious or fraudulent act, error, omission or PERSONAL INJURY committed by an INSURED. This exclusion does not apply to any INSURED who is not so adjudged. This exclusion also does not apply to any insured who did not commit, know or acquiesce in such WRONGFUL ACT which is the basis of the claim.

G.    any WRONGFUL ACT occurring prior to the initial effective date of this POLICY if any member of the management committee or other governing body knew or could have reasonably foreseen that such WRONGFUL ACT might be the basis of a CLAIM.

(Ex. A, Section III., Exclusions.)

### Reservation of Rights Letters

38.    Westport received an e-mail from John Burson on October 28, 2010 reporting the issue regarding attorneys/substitute trustees at S&B signing affidavits for other attorneys/substitute trustees in connection with foreclosure filings. Mr. Burson requested that pre-litigation counsel be appointed to advise as to the firm's disclosure obligations with regard to the "signature issues."

39.    On November 17, 2010, Westport issued a reservation of rights letter to S&B, Mr. Burson, Erik Yoder and Jason Murphy, offering the insureds selection of pre-litigation counsel,

11

subject to a reservation of rights, to advise them with regard to their disclosure obligations and to represent them in connection with the various Show Cause Orders and subsequent hearings. A true and correct copy of Westport's November 17, 2010 reservation of rights letter is attached as Exhibit K.

40. Later, after the initial Smalley Complaint was filed, and by letter dated May 10, 2011, Westport agreed to offer a defense to S&B, Burson, Savage, Yoder and Murphy, among others, to the Smalley Class Action Complaint, subject to a reservation of rights on the basis of, among other provisions, certain exclusions as well as the Policy's definition of "LOSS," set forth above. A true and correct copy of Westport's May 10, 2011 reservation of rights letter is attached as Exhibit L.

41. By letters dated October 13, 2011 and October 17, 2011, Westport issued a supplemental reservation of rights letter and agreed to continue to offer a defense to S&B, Burson, Savage, and Murphy, respectively, to Smalley's First Amended Class Action Complaint, subject to a reservation of rights on the basis of, among other provisions, certain exclusions, including the prior knowledge exclusion, as well as the Policy's definition of "LOSS," set forth above, and further reserved the right to pursue rescission of the Policy in the event material misrepresentations were made in the procurement of the Policy. A true and correct copy of Westport's October 13, 2011 and October 17, 2011 reservation of rights letters are attached as Exhibits M and N.

42. By letter dated November 7, 2011, Westport agreed to offer a defense to S&B to the Molina Complaint, subject to a reservation of rights on the basis of, among other provisions, certain exclusions, including the prior knowledge exclusion, as well as the Policy's definition of "LOSS," set forth above, and further reserved the right to pursue rescission of the Policy in the

event material misrepresentations were made in the procurement of the Policy. A true and correct copy of Westport's November 7, 2011 reservation of rights letter is attached as Exhibit O.

43. By letter dated December 7, 2011, Westport declined coverage for the Murphy Complaint on the basis of, among other provisions and exclusions, that the allegations of the Murphy Complaint do not arise from the rendition of "PROFESSIONAL SERVICES," as required by the Policy, and under the insured versus insured exclusion. A true and correct copy of Westport's December 7, 2011 declination letter is attached as Exhibit P.

## Count I

### Declaratory Judgment - Rescission

44. The allegations in paragraphs 1 through 43 are re-alleged and incorporated in this Count.

45. As described above, John Burson, as managing partner of S&B, provided a signed renewal application dated June 15, 2010 and a Warranty Statement dated July 9, 2010 that contained material misrepresentations and omissions.

46. Westport issued the Policy in reliance on these representations and warranty in the renewal application.

47. Burson knowingly misrepresented to Westport in the July 9, 2010 warranty statement that he was unaware of any claim or any circumstances, acts, errors or omissions that could result in a professional liability claim, even though Burson knew, at least as early as April 2010, of the "signature issues" wherein S&B attorneys Yoder and Murphy had improperly signed one another's names to voluminous affidavits in foreclosure actions filed in various courts in Maryland.

13

Case 1:12-cv-00070-LMB-JFA Document 1 Filed 01/23/12 Page 14 of 17 PageID# 14

48. Had the renewal application from Burson accurately disclosed these facts and circumstances, Westport would not have issued the Policy as written, would have charged a different premium rate, or not issued a Policy at all.

49. Because Westport relied on the material misrepresentations and misstatements in the renewal application and Warranty Statement for Policy No. WLL301004648205 to its detriment by issuing a Policy it would not have otherwise issued or would have issued at a different premium rate, the Policy should be rescinded and declared void *ab initio* and the parties should be returned to the status *quo ante*.

### Count II

### In the Alternative, Declaratory Judgment- No Coverage Based on the "Prior Knowledge" Exclusion

50. The allegations in paragraphs 1 through 49 are re-alleged and incorporated in this Count.

51. The underlying plaintiffs and claimants in the Smalley and Molina class action lawsuits, and the Murphy Complaint, assert that S&B knowingly employed an illegal "robo-signing operation" and was aware of the "signature issues" concerning S&B attorneys/ substitute trustees signing affidavits for one another prior to the inception of the Policy on July 21, 2010.

52. Further, the April 5 and April 7, 2010 e-mails demonstrate that John Burson, the managing partner of S&B, was aware that Murphy and Yoder had been signing one another's names to affidavits in foreclosure filings prior to the inception of the Policy on July 21, 2010, and that such "signature issues" could result in a professional liability claim. (Exhs. F, I.)

53. Moreover, S&B's knowledge that the "signature issues" could result in a professional liability claim is evidenced by S&B holding a meeting in April 2010 wherein it instructed Murphy and Yoder to no longer sign one another's names to affidavits.

14

54. These facts and circumstances, and others alleged in the Smalley, Yoder and Murphy Complaints, establish that Burson, as managing partner of S&B, knew or could have reasonably foreseen, prior to the inception of the Policy, that the "signature issues" might be expected to be the basis of a claim or lawsuit.

55. Accordingly, Westport is entitled to a declaration that the Policy's Prior Knowledge Exclusion set forth in Exclusion G. bars coverage for the underlying Smalley, Molina and Murphy Complaints.

## Count III

### In the Alternative, Declaratory Judgment- No Coverage for the Alleged Damages

56. The allegations in paragraphs 1 through 55 are re-alleged and incorporated in this Count.

57. The Smalley plaintiffs have requested punitive damages, treble damages, and disgorgement of attorney's fees. (Ex. D, p. 35.)

58. Claimant Molina and the Murphy Complaint plaintiffs, Murphy and Yoder, have similarly sought punitive damages. (Ex. E, p. 38; Ex. F, p.17.)

59. Damages awarded to the underlying plaintiffs and/or claimants in the Smalley, Molina and Murphy actions in the nature of punitive damages, treble or multiplied damages, and disgorgement do not qualify as "LOSS" as the term is defined in the Policy.

60. Accordingly, Westport is entitled to a declaration that, in the event that punitive damages, treble or multiplied damages or disgorgement are awarded to the underlying plaintiffs and/or claimants in the Smalley, Molina or Murphy actions, coverage for such relief does not attach under the Policy pursuant to the terms and conditions of the Policy, including but not limited to the definition of "LOSS", and pursuant to public policy.

## Count IV

### In the Alternative, Declaratory Judgment- Reformation

61. The allegations in paragraphs 1 through 60 are re-alleged and incorporated in this Count.

62. The Policy was mistakenly issued with two Extended Reporting Period Endorsements as a result of a scrivener's error. Specifically, the Policy issued to S&B included both the correct Extended Reporting Period endorsement, Form No. SP 1 871, and an incorrect Extended Reporting Period With Option to Reinstate Limits endorsement, Form No. SP 2 407. (Ex. A at Schedule 1A (SP 1 866 0202), SP 1 871 0202, SP 2 407 1002.)

63. S&B was charged no additional premium and provided no consideration for the inclusion of the incorrect Extended Reporting Period With Option to Reinstate Limits endorsement, Form No. SP 2 407.

64. Accordingly, Westport is entitled to reformation of the policy to delete the incorrect Extended Reporting Period With Option to Reinstate Limits endorsement, Form No. SP 2 407, which was inadvertently issued with the Policy to S&B, based upon a scrivener's error.

## DEMAND FOR JUDGMENT

Wherefore, Westport Insurance Corporation, respectfully requests that the Court enter a judgment (i) declaring the Policy is void *ab initio* and that the parties are to be returned to the status *quo ante*; (ii) in the alternative, declaring that Westport Insurance Corporation owes no duty to defend or indemnify S&B and its current and former attorneys in the lawsuits and claims described herein, including but not limited to the claims asserted by Charles Smalley, Pamela Ball, Samuel Molina, Jason Murphy and Erik Yoder, because they are barred from coverage by

applicable exclusions in the Policy; (iii) declaring that Westport Insurance Corporation owes no duty to defend or indemnify any insureds for any punitive damages, treble damages and disgorgement, or any other relief that does not satisfy the Policy definition of "LOSS"; (iv) awarding Westport Insurance Corporation the CLAIMS EXPENSES it has paid to date in connection with the insureds' defense in the underlying actions; (v) granting Westport reformation of the Policy to delete the Extended Reporting Period With Option to Reinstate Limits endorsement, Form No. SP 2 407, from the Policy, on the basis that such form was included by scrivener's error; and (vi) providing Westport Insurance Corporation such other and further relief as the Court deems appropriate and just.

This the 23rd day of January 2012.

Respectfully submitted,

_____
WESTPORT INSURANCE CORPORATION

BY COUNSEL:

Joseph F. Cunningham, VSB #24781
Robert J. Gastner, VSB #74908
CUNNINGHAM & ASSOCIATES, PLC
1600 Wilson Boulevard, Suite 1008
Arlington, Virginia 22209
Phone: (703) 294-6500
Fax: (703) 294-4885
jcunningham@cunninghamlawyers.com
rgastner@cunninghamlawyers.com
*Counsel for Plaintiff*